# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0036-MR

BRUCE CARR                                             APPELLANT

v.

ON APPEAL FROM JACKSON CIRCUIT COURT
HONORABLE OSCAR G. HOUSE, JUDGE
NO. 20-CR-00045-001

COMMONWEALTH OF KENTUCKY                   APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Bruce Carr appeals from his convictions by the Jackson Circuit Court after a jury trial for criminal complicity to commit murder. On appeal, Carr argues the trial court erred by not granting him a directed verdict and allowing the introduction of evidence of his methamphetamine use. Finding no error, we affirm.

## I. FACTUAL AND LEGAL BACKGROUND

The victim, Elijah Rader, was an elderly man who lived in a camper without electricity or running water in rural Jackson County. Rader owned a 2007 Hummer 8300 that would become the focus of the theft which would result in his murder.

On January 31, 2020, a friend stopped by Rader's camper and noticed that his Hummer was missing and that his cell phone was still inside the

camper. Police responded and over the next few days discovered transactions were occurring on one of Rader's bank accounts. Video of one of these transactions showed Jesse Gibson using Rader's card at the Walmart in London, Kentucky. Video from a gas station in Tennessee showed Gibson with another male and a female together with Rader's Hummer. The Hummer was finally located in Jasper, Florida, where Gibson and Brittany Marcum were arrested. Upon his return to Kentucky, Gibson informed the Kentucky State Police where they could locate Rader's body. Rader had been shot in the back with a shotgun. Gibson also told police that Carr was the shooter and had forced Gibson "to do everything" at gunpoint even though none of the video evidence gathered showed any attempts by Gibson to flee or seek help.

In April 2022, Bruce Carr and Melissa Gulley were located and arrested in Clayton, Wisconsin. During questioning, Carr acknowledged he was holding the shotgun when his group first approached Rader's trailer to confront him and steal his Hummer. Ultimately, Gibson and Gulley both pled guilty to complicity to commit murder while Carr proceeded to trial on charges of murder and theft of the Hummer.

Gibson testified he brought the shotgun used in the murder to a meeting with Carr and Gulley where they all used methamphetamine and mutually agreed to steal Rader's Hummer and leave Kentucky. According to Gibson, it was Carr's idea to forcibly take the Hummer from Rader. At the time, both Gibson and Gulley were wanted by law enforcement and Carr was in a relationship with Gulley. Gibson claimed there had been no discussion of

2

killing Rader prior to taking the Hummer but Carr made the decision out of fear that Rader would identify them to authorities.

Gulley testified Gibson showed up with the shotgun, he and Carr discussed stealing the Hummer and she decided to go along with them to Rader's trailer. Gulley acknowledged Gibson offered the shotgun to Carr and the three of them waited for Rader to return home. When Rader returned, Gulley knocked on his camper door to ask to use the phone and then Carr and Gibson approached with Carr holding the shotgun. Gibson instructed Rader to hand him the keys to the Hummer and all four got into the vehicle. They made several stops including one to Rader's other camper where they stole tools they later traded for cash and drugs. During this time, Carr guarded Rader in the back seat of the Hummer with the shotgun. Later, Gibson drove the party down a logging road where Carr and Rader got out. Gibson and Gulley continued driving and turned the vehicle around. Gibson heard a gunshot and when they returned to pick up Carr, he had blood on his hands.

Gulley stayed with a friend that night and was picked up the next morning by Gibson, Carr and Marcum. After a night in a motel, all four drove towards Florida. According to Gulley, she and Carr became separated from Gibson and Marcum at a Walmart in Georgia when Carr went for a walk after becoming paranoid while he was "high." Carr contacted his family in Wisconsin who arranged for bus tickets to Wisconsin for Gulley and Carr. They stayed in Wisconsin with Carr's family until they were arrested.

The trial court granted Carr's motion for a directed verdict on the theft charge. The jury was instructed on murder (with Carr as the shooter), criminal complicity to commit murder (with Gibson as the shooter), and alternatively criminal facilitation to commit murder.

The jury found Carr guilty of criminal complicity to commit murder and the trial court sentenced Carr in accordance with the jury's recommendation to the minimum sentence of twenty years in prison. Carr appeals his conviction and sentence as a matter of right.

## II. LEGAL ANALYSIS

Carr argues: (1) the trial court should have granted his motion for a directed verdict because there was insufficient evidence to find that he intended for Rader to be killed; and (2) he was unduly prejudiced by evidence of his methamphetamine use.

### A. Was Sufficient Evidence Presented of Carr's Intent to Support his Conviction?

Carr's counsel moved for a directed verdict at the close of the Commonwealth's case and again at the close of the defense's case. Counsel also objected to the jury being given an instruction on complicity arguing that the Commonwealth had built its case on Carr being the shooter and had not introduced sufficient evidence of Carr's intent under the complicity theory. In considering whether a motion for directed verdict should be granted, "[t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be

4

given unless the evidence is insufficient to sustain a conviction."

*Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

As stated in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991):

If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appeal, the denial of a directed verdict motion is reviewed to determine whether "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017) (quoting *Benham*, 816 S.W.2d at 187).

Carr argues that under the instruction given to the jury on criminal complicity,[1] he could only be guilty if he "possessed the intent that Gibson commit the criminal act of murdering Rader," citing our opinion in *Commonwealth v. Norse*, 177 S.W.3d 691, 699 (Ky. 2005). According to Carr, his participation in the theft of the Hummer was not sufficient evidence to substantiate complicity in Rader's murder citing to *Marshall v. Commonwealth*, 60 S.W.3d 513, 518 (Ky. 2001), where we stated "although intent that a victim

---

[1] The complicity instruction made Carr's conviction dependent on the jury finding: (a) ". . . Jesse Gibson killed Elijah Rader by shooting him with a gun;" (b) "that before the killing . . . [Carr] had aided or counseled Jesse Gibson to kill Elijah Rader"; and (c) "that in so doing, [Carr] intended that Elijah Rader would be killed."

5

be killed may be inferred from conduct or knowledge, such intent may not be predicated on the mere intent to participate in the underlying felony."

In contrast, the Commonwealth argues that there was sufficient evidence introduced of Carr's intent that Rader should die for the jury to make its determination.

In considering this issue we must address what is required for a conviction of murder by complicity. Kentucky Revised Statutes (KRS) 502.020 describes the theory under which a person can be found guilty of "complicity to the act," which applies when the principal actor's conduct constitutes the criminal offense:

> (1) A person is guilty of an offense committed by another person when, *with the intention of promoting or facilitating the commission of the offense,* he:
>
> > (a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
> >
> > (b) Aids, counsels, or attempts to aid such person in planning or committing the offense[.]

(Emphasis added.)

> In *Tharp v. Commonwealth*, 40 S.W.3d 356, 361 (Ky. 2000), we stated:

> In the context of criminal homicide, a defendant can be found guilty by complicity of an intentional homicide (intentional murder or manslaughter in the first degree) under KRS 502.020(1) only if there is evidence that he/she either actively participated in the actions of the principal . . . *with the intent* that the victim's death (or serious physical injury per KRS 507.030(1)(a)) would result.

(Emphasis added) (footnote omitted).

Since the jury obviously determined that it was not Carr who fired the fatal shot into Rader's back, we can confine our analysis to whether there was evidence from which the jury could determine that Carr intended Rader's death "would result" from his active participation with the actions of the group. In such contexts we have determined:

> [I]ntent may be inferred from the actions of a defendant or from the circumstances surrounding those actions. Intent may also be inferred from knowledge. However, although intent that a victim be killed may be inferred from conduct or knowledge, such intent may not be predicated on the mere intent to participate in the underlying felony.

*Marshall*, 60 S.W.3d at 518 (citations omitted).

There was certainly sufficient evidence of Carr intentionally and actively participating "in the underlying felony" regarding the original conspiracy to steal the Hummer, but the real issue is whether his intent regarding Rader's murder may be inferred from the full circumstances leading up to Rader's death. We know that Carr was along for every step leading up to Rader's murder and through Rader's burial, the concealment and attempted destruction of the shotgun, and his flight with Gibson, Marcum, and Gulley from Kentucky through Tennessee and into Georgia before he was left behind.

Based on the execution-style murder of Rader, there is no doubt that he was intentionally killed. While Carr's intent that Rader be killed while Gibson wielded the shotgun may be marginally less obvious, "the fact-finder has wide latitude in inferring intent from evidence of the defendant's conduct and knowledge, and/or the surrounding circumstances." *Id.*

7

At trial, the jury heard sufficient evidence from which it could infer that Carr intended Rader's death even if he was not the person who shot him. This included testimony about Carr's conduct during the whole course of events, which included his active participation in planning and implementing the robbery, concealing Rader's body, driving off with his Hummer, and using his card to access money. It was reasonable for the jury to infer that Carr agreed with Gibson's decision to murder Rader to conceal their crimes, and it would have been inappropriate for the trial court to resolve this issue by granting a directed verdict.

## B. Did the Court Err by Allowing Testimony Regarding Carr's Use of Methamphetamine? — Preserved

During Gibson's testimony he told the jury that he brought methamphetamine with him to his initial meeting with Carr and began describing getting high with him and Gulley. Carr's counsel objected and at a bench conference explained:

> Counsel: I just object, this is another bad act of possession of drugs that hasn't been noticed by the Commonwealth.
>
> Judge: So, he's not being prosecuted, he's not being prosecuted for it.
>
> Defense Counsel: So, I just object to this line of question, it's irrelevant, it's not noticed, it's putting him in a bad light, it's a bad light, it's a . . .
>
> Judge: Overruled.

Carr argues that testimony regarding his use of methamphetamine was irrelevant under Kentucky Rules of Evidence (KRE) 401 which requires that evidence be relevant before it can be admitted, and further, that even if such

8

evidence was relevant, it should have been excluded pursuant to KRE 403 because of the undue prejudice resulting from its admission.

Carr also directs us to KRE 404(b) which excludes evidence of other crimes or bad acts unless the evidence falls within certain enumerated exceptions. The Commonwealth asserts that such testimony was "fleeting" and "not otherwise emphasized" by the Commonwealth and therefore harmless in that it could not have caused the jury's verdict, citing to *Winstead v. Commonwealth*, 283 S.W.3d 648, 688-89 (Ky. 2009). Before determining whether the admission of such testimony was harmless error, we will first decide whether error was committed at all.

We review the trial court's decision to admit such evidence for abuse of discretion. *Burke v. Commonwealth*, 506 S.W.3d 307, 318 (Ky. 2016).

KRE 404(b), which concerns character evidence regarding "other crimes, wrongs, or acts[,]" provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> > (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> >
> > (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

Of note, "the list provided in KRE 404(b)(1) is illustrative rather than exhaustive." *Kelly v. Commonwealth*, 655 S.W.3d 154, 165 (Ky. 2022). It is usually fairly easy to determine whether evidence is relevant and probative.

9

Typically, the more challenging part of this evaluation is weighing "the prejudicial nature of the 'other bad acts' evidence versus its probative value." *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019).

To justify its exclusion, "[t]he prejudice must go beyond that which is merely detrimental to a party's case and be of such character that it 'produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose.'" *Kelly*, 655 S.W.3d at 165 (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[3][d], at 135 (4th ed. 2003)).

Illicit drug use would be evidence of another crime, generally prohibited by KRE 404(b), but KRE 404(b)(1) allows for the admission of evidence regarding other crimes, "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" To determine the admissibility of "bad act evidence," we have adopted the three-prong test described in *Bell v. Commonwealth*, 875 S.W.2d 882, 889–891 (Ky. 1994), which evaluates the proposed evidence in terms of: (1) relevance, (2) probativeness, and (3) its prejudicial effect.

KRE 404(b) would be applicable if the evidence of drug use were introduced with the intention of showing that Carr was acting in conformity with his character to commit one bad action (methamphetamine use) when the charged bad act (complicity to commit murder) occurred (*i.e.,* "prove the character of a person in order to show action in conformity therewith").

10

*Kentucky Farm Bureau Mut. Ins. Co. v. Rodgers*, 179 S.W.3d 815, 819 (Ky. 2005).

The Commonwealth was not offering testimony of drug use to show Carr was predisposed to criminal behavior. The evidence offered that Carr used drugs immediately prior to Rader's murder went instead to his potential "motive, opportunity, intent, preparation, [or] plan" under KRE 404(b)(1). We can safely determine that the evidence presented of Carr's drug usage was both relevant and probative under the facts of this case and the presentation of such drug usage had limited, if any, prejudicial effect. This conclusion is reinforced by the fact the jury determined that Carr was not the principal actor in the murder of Rader.

The evidence here was also of such a nature as to be "inextricably intertwined with other evidence essential to the case." KRE 404(b)(2). Excluding all mention of drug use would have seriously altered testimony about: (1) the circumstances regarding the formulation of the plan to rob Rader; (2) one of the motivations for the crime; (3) what the parties did with some of the proceeds of their robbery; and (4) the circumstances of how Carr was separated from Gibson after the murder. In sum, the *res gestae* of the case involved Carr's drug use. Carr's drug use was inextricably intertwined with the events surrounding Carr's murder and the trial court did not err in allowing testimony regarding Carr's drug usage during the times attendant thereto.

11

## III. CONCLUSION

We affirm Carr's conviction and sentence by the Jackson Circuit Court.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Bryan D. Morrow
Deputy Solicitor General